IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF SKYANNA T. & BENJAMIN G.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF SKYANNA T. & BENJAMIN G., CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

KAITLYN G., APPELLANT.

Filed February 4, 2025.    Nos. A-24-073, A-24-074.

Appeals from the County Court for Dodge County: FRANCIS W. BARRON III, Judge. Affirmed.

Jerrod Jaeger, of Jaeger Law Office, P.C., L.L.O., for appellant.

Pamela Lynn Hopkins, Dodge County Attorney, and James McCave for appellee.

RIEDMANN, Chief Judge, and MOORE and BISHOP, Judges.

MOORE, Judge.

## I. INTRODUCTION

Kaitlyn G. appeals from an order of the Dodge County Court, sitting as a juvenile court, terminating her parental rights to two of her children. Upon our de novo review of the record, we affirm the juvenile court's order.

## II. STATEMENT OF FACTS

Kaitlyn is the biological mother of Skyanna T., born in August 2018; and Benjamin G., born in January 2021. The children share the same biological father. The father relinquished his parental rights in March 2022, and we only discuss him as necessary to the resolution of the current appeal by Kaitlyn.

- 1 -

## 1. Procedural Background

Skyanna was removed from her parents' care on June 20, 2019, after Skyanna had been admitted to Children's Hospital in Omaha for failure to thrive. A petition was filed on July 1 to adjudicate Skyanna pursuant to Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016) based on Kaitlyn's failure to properly care for Skyanna, resulting in Skyanna's hospitalization; homelessness; failure to address her mental health; reported domestic violence in the home between herself and the father; failure to provide a safe and stable home; and failure to generally provide proper parental care, all of which placed Skyanna at risk for harm. Skyanna was adjudicated on July 17.

The juvenile court entered a dispositional order on September 4, 2019, adopting the case plan presented by the Nebraska Department of Health and Human Services (the Department). Kaitlyn's case plan goals involved properly caring for Skyanna's basic needs, including her feeding, and eliminating domestic violence from the home. Review hearings were held on February 12, 2020; July 22; and November 18. The goals of the court adopted plans were consistent during this time.

Benjamin was removed from Kaitlyn's care at birth in January 2021 and a petition was filed on March 1 to adjudicate Benjamin pursuant to § 43-247(3)(a) based on Kaitlyn's open juvenile case regarding Skyanna; failure to make progress on her case plan goals; continued concerns regarding domestic violence between herself and the father; failure to provide a safe and stable home; and failure to provide proper parental care, all of which placed Benjamin at risk for harm. Benjamin was adjudicated on June 3.

On March 1, 2021, the State filed a motion for termination of Kaitlyn's parental rights in regard to Skyanna, alleging statutory grounds to terminate existed pursuant to § 43-292(2), (6), and (7), and alleging that termination was in Skyanna's best interests.

Additional review hearings were held on February 17, 2021; August 30; and November 3. In the November case plan, Benjamin was added to Kaitlyn's goals of properly caring for her children's needs and eliminating domestic violence from the home.

On April 22, 2022, the State filed amended motions for termination of Kaitlyn's parental rights regarding both Skyanna and Benjamin, alleging statutory grounds to terminate existed pursuant to § 43-292(2), (6), and (7), and alleging that termination was in the best interests of the children.

The April 28, 2022, the Department case plan eliminated Kaitlyn's original goals and changed the goal to successfully managing her mental health. On May 3, Kaitlyn filed an objection to the case plan, alleging that the April 28 case plan was a departure from the previous case plans and was "inherently unreasonable."

The April 28, 2022, case plan was received over Kaitlyn's objection at the May 4 review hearing. Kaitlyn appealed the juvenile court's admission of the case plan into evidence. This court summarily dismissed Kaitlyn's appeal. See *In re Interest of Skyanna T.*, 31 Neb. App. xxiv (No. A-22-382, Aug. 16, 2022).

## 2. Trial

The termination trial was held over the course of 4 days in November 2022 and March 2023. At the trial, 14 witnesses testified and nearly 50 exhibits were received by the juvenile court.

(a) Kaitlyn's Mental Health

MaLeaha Semerad, a licensed mental health practitioner, began seeing Kaitlyn for weekly therapy in January 2022. Kaitlyn had initially seen another therapist in Semerad's practice and had requested a change in therapist as Kaitlyn was seeking out Eye Movement Desensitization and Reprocessing (EMDR) therapy to work on her trauma history. EMDR is often an emotionally intense therapy because it can bring back the same images, sounds, and triggers of the specific trauma that Semerad and the client are working to process. As such, Semerad ensures that the client can emotionally regulate prior to be beginning EMDR therapy.

Kaitlyn never progressed to EMDR therapy with Semerad because Kaitlyn had difficulty with regulating her emotions due to the stressors in her life. Semerad noted that Kaitlyn was unable to talk about disturbing images and events from her past without becoming so overwhelmed that sessions were not productive. Kaitlyn reported a history of childhood physical and emotional abuse to Semerad.

Kaitlyn had been diagnosed with borderline personality disorder and Semerad found the diagnosis to be accurate. Semerad described a person with borderline personality disorder as having "really huge reactions to perceived or real abandonment." The person would also be irritable, angry, and hostile; present with a history of chaotic and unstable relationships; and have an inability to problem solve.

Kaitlyn's therapeutic treatment plan included reteaching her how to handle everyday life and accompanying stressors. Kaitlyn worked on her treatment plan by challenging distorted self-talk, practicing emotional regulation before having conflict with someone, and learning how to set boundaries without lashing out. Kaitlyn's coping skills included taking deep breathes, counting to 10, utilizing her personal supports, and stepping away from the situation. Kaitlyn's level of engagement in therapy sessions depended on her mood. Her symptoms remained moderate to severe and Semerad noted minimal progress during her time with Kaitlyn.

In an April 2022 progress letter, Semerad stated that Kaitlyn continued to struggle with emotional instability. At trial, Semerad described that on most days of the week, Kaitlyn was lashing out, shutting down, crying, and not able to maintain relationships. Semerad would see Kaitlyn progress for a few weeks, but the progress was not sustained. Kaitlyn reported that she would lash out at her caseworker and visitation workers by name calling, swearing, and making inappropriate remarks. Kaitlyn struggled with both observing her environment and identifying what was going to make her upset, and in utilizing her coping skills.

Kaitlyn ceased therapy with Semerad in February 2023. The day before the discharge, Semerad had a "duty-to-report" to law enforcement regarding a statement that Kaitlyn made during their session. Kaitlyn had thoughts of wanting to kill her current visitation worker, who was employed through the same agency as Semerad. Semerad's supervisor determined that Kaitlyn needed to be discharged due to Kaitlyn's high-risk behaviors and threats. Semerad observed that while expressing anger and hostility is typical of someone with borderline personality disorder, the specific statements of violence made by Kaitlyn were not.

At the time of discharge, Semerad predicted a poor outcome for Kaitlyn's mental health unless she proceeded with more frequent and consistent therapy.

Jessica Watchorn supervised the Department caseworkers assigned to Kaitlyn's case since October 2019. Watchorn stated that Skyanna had been removed from Kaitlyn's care on two occasions. Skyanna was removed the first time in June 2019 after she was hospitalized for failure to thrive, and Kaitlyn admitted to not feeding Skyanna because she had gotten flustered and overwhelmed by Skyanna refusing to eat. Skyanna was reunified with Kaitlyn in January 2020. During this time, Kaitlyn was in a relationship with the children's father.

However, the Department began receiving multiple reports that law enforcement was responding to domestic violence allegations made by both Kaitlyn and the father. At one point, a physical altercation occurred while Kaitlyn was holding Skyanna. The Department also received reports that Kaitlyn and the father were struggling to adequately supervise Skyanna.

The Department implemented a safety plan in May 2020, which included that the father would stay at his parents' home with Skyanna and that Kaitlyn would not be left alone with Skyanna. Soon after, the Department received phone calls and text messages from the father indicating that he and Kaitlyn were going to live together and were not going to follow the safety plan. Due to neither parent being willing to follow the safety plan and concerns regarding domestic violence in the home, Skyanna was found to be unsafe and was removed for a second time in May 2020.

Jack Leonard was the family's caseworker from May 2020 until February 2021. When Leonard took over the case in 2020, Skyanna had recently been removed from her home the second time. During his time on the case, Kaitlyn and the father's relationship was the main barrier to case progression. Leonard described the relationship as volatile and "on and off," which impacted the parents' ability to participate in visitation.

Leonard stated that Kaitlyn was "infatuated" with the father and "obsessed" with what he was doing. At times, Kaitlyn would cancel visitation with Skyanna to instead see the father at his place of work. Throughout Leonard's time on the case, there were multiple situations where Kaitlyn and the father would have contact though they were advised not to.

Leonard worked to identity supports whom Kaitlyn could call to avoid the urge to call the father. However, the multiple informal supports fell through because of the frequent contact by Kaitlyn. Kaitlyn struggled to maintain healthy boundaries with her support system and the supports described the contact by Kaitlyn as "tedious." Kaitlyn would involve the informal supports in the juvenile case and request that the supports advocate for her in specific situations where they did not feel comfortable.

Kaitlyn and the father broke up in late 2020, which allowed them to work on separate case plans. There would be periods of time when Kaitlyn would make progress on her case plan by attending visits, participating in services, and avoiding contact with the father. However, Leonard noted that Kaitlyn's consistency lasted only about 2 to 3 months before she "just completely spirals" and regressed with the case plan.

Leonard was the family's caseworker at the time Benjamin was removed from Kaitlyn's care shortly after his birth. Leonard explained that Kaitlyn's oldest child (not at issue in this case) had been diagnosed with failure to thrive due to feeding issues, and that Skyanna was initially removed because of a failure to thrive diagnosis. According to Leonard, this pattern provided the

Department with a clear indication that Kaitlyn had not shown an ability to provide appropriate sustenance to an infant.

The father had taken over the feeding of Skyanna when he and Kaitlyn were still together, and without him in the home the Department was concerned that Benjamin would not be fed, as historically Kaitlyn had been unable to feed infant children regularly. To ensure the safety of Benjamin, the Department recommended his removal from Kaitlyn's care.

When Kaitlyn was asked how she remedied the feedings issues with Skyanna, she responded:

> We took her to the doctors. Her doctors were the ones, I think, that caused the main problem. They were wanting . . . us to feed her on a time schedule, like set an alarm when she was an infant . . . and feed her by an alarm and force feed her. And then force feeding her wasn't working. She was projectiling [sic]. And that's when the failure to thrive became a situation.

Kaitlyn testified that her mother and other doctors helped her with feeding Skyanna and that Skyanna eventually grew out of her failure to thrive.

At the time the case was transferred to the subsequent caseworker, Leonard felt that Kaitlyn had not demonstrated an ability to provide or prioritize care for her children.

Katlyn Wacker-Ventris has been the family's caseworker since February 2021. Wacker-Ventris described "multiple times" where Kaitlyn was sufficiently progressing in her case plan. However, each time the case moved forward, something would happen that would "put the children's needs in danger," requiring the Department to provide reinforcements to assist Kaitlyn in addressing those needs. Wacker-Ventris testified that the case was still ongoing because the children's needs were being neglected due to Kaitlyn's mental health. Wacker-Ventris conducted a Family Strengths and Needs Assessment in March 2021. The assessment identified that Kaitlyn needed to work on her mental health with her therapist and needed help with budgeting. The results of the assessment were reflected in Wacker-Ventris' subsequent case plans. Kaitlyn's case plan goals were to be able to parent her children while working on her mental health at the same time.

Services for Kaitlyn have included fully supervised visitation in her home for roughly 30 hours a week, individual therapy, family support, and intensive family reunification and preservation. Kaitlyn also participated in weekly parenting classes and the Head Start program. Kaitlyn testified that she participated in over 100 parenting classes. Kaitlyn was presently working with a Preparation for Adult Living Services coach on obtaining her driver's license. At the time of trial, Kaitlyn was no longer receiving family support because Kaitlyn was using the service for transportation or to run errands rather than work on her set goals. Visitation workers likewise reported that Kaitlyn used visitation services to run errands.

Though Kaitlyn and the father were not together romantically at the time Wacker-Ventris took over the case, their relationship continued to cause some difficulty in the case progress. Wacker-Ventris indicated that Kaitlyn would reach out to the father, though a protection order barring contact between the two was in place. At times, Kaitlyn created fake social media accounts to reach out to him. Kaitlyn would also send the father messages about the children in an effort to taunt him about her connection to them. Wacker-Ventris cited Kaitlyn's contact with the father as

an example of Kaitlyn's poor boundaries and why individual therapy was instituted. Kaitlyn has not had contact with the father since April 2022.

Kaitlyn receives disability benefits based on her mental health and has utilized various government programs and community resources to access food and diapers. She has also asked Wacker-Ventris for Department grocery vouchers on occasion. Kaitlyn was able to access a Section 8 housing voucher in September 2022 and has utilized the additional money in her budget for more food for the children.

Kaitlyn was employed twice during the case, for 3 weeks or less each time. She had recently applied for additional employment and had been offered a position. Kaitlyn would likely qualify for additional government benefits if her children were reunified with her.

Walker-Ventris reported that Kaitlyn has struggled in the past to save enough money to ensure that the children had enough food and other necessities when they came to her home for visitation. Visitation workers have had to prompt Kaitlyn to provide food to the children during visits. Occasionally Kaitlyn has been able to provide parental care and daily necessities for the children unprompted, but it has not been consistent. Wacker-Ventris conceded that the Department was no longer concerned about Kaitlyn's ability to feed her children.

Kaitlyn's money management remained a concern to both the Department and various workers during the case. Kaitlyn is on a limited, though sustainable, budget due to her government benefits. However, family support and visitation workers reported that Kaitlyn overspends on items such as salon services or fast food. Kaitlyn worked with family support on the creation of a budget and basic money management skills, but Wacker-Ventris has not seen Kaitlyn utilize these skills without family support. Wacker-Ventris is concerned that if Kaitlyn struggles to budget appropriately, that the children's daily needs, such as food and diapers, would not be met if they were reunified with Kaitlyn.

Kimberly Nelson, an independent living coach for young adults, was referred to Kaitlyn through the Head Start program in the spring of 2022. Kaitlyn completed the Opportunity Passport financial literacy class, where Kaitlyn received education on credit and saving. Together, Nelson and Kaitlyn put together a budget. Kaitlyn always pays her financial obligations first, though Nelson does not see Kaitlyn utilizing other skills learned in the financial literacy class on a consistent basis. Kaitlyn would recall skills if prompted by Nelson.

Kaitlyn would sometimes run out of money before the end of the month. Nelson noticed a trend of impulsivity and Kaitlyn buying items to self soothe. None of the items purchased by Kaitlyn were "wrong," but Nelson noted that they were not planned purchases that fit into Kaitlyn's budget. Kaitlyn would dip into her savings to cover the unexpected costs.

Nelson described some "ebb and flow" to Kaitlyn's attendance at weekly meetings. Kaitlyn would not come to two or three scheduled meetings before getting back into regular attendance. This occurred three times in the past year. Kaitlyn once canceled a meeting with Nelson because she was tired and needed a nap after having visitation with her children. Kaitlyn told Nelson that she was overwhelmed by the various meetings and appointments involved in the juvenile case, despite being unemployed.

Kaitlyn agreed that the skills she was working on with Nelson were the same skills she had been working on with family support and intensive family reunification. She conceded that she was still trying to master skills like budgeting 2 to 3 years later.

Kaitlyn's current visitation worker, who has been working with the family since August 2022, testified that Kaitlyn always had food and toys at the children's visits and usually plans for one fun outing a month, such as taking the children to Build-A-Bear or a carnival. However, in October 2022, Kaitlyn told the worker that she could not afford to take the children on an outing as she was "negative in her account."

Kaitlyn has told Wacker-Ventris that she feels overwhelmed. These feelings are caused by basic parental tasks, such as picking up the toys after her children's visits are over or managing the children's tantrums. There were occasions when Kaitlyn would tell the case professionals during visitations that she was overwhelmed and must take a break from parenting. Meanwhile, her children were still present at the visit and because Kaitlyn was not focusing on them, a visitation worker would have to supervise the children to ensure their safety. One visitation worker testified that in 2022, Kaitlyn had to contact her psychiatrist during a visit to calm herself down.

Visitation workers stated that when Kaitlyn is overwhelmed, she becomes very animated, speaks quickly, and turn red in the face. When this occurs, the children are confused by Kaitlyn's behavior. Other times, Kaitlyn can maintain her composure and not become visibly upset.

Outside of Kaitlyn feeling overwhelmed, interactions with the children are positive, as Kaitlyn is very loving and available to the children. One visitation worker observed that Skyanna was more affectionate toward Kaitlyn than Benjamin was, and the worker believed this was because Kaitlyn and Benjamin lacked a true parent-child bond.

Visitation notes from March to August 2022 show that the worker was concerned about Kaitlyn's mental health and her ability to financially support the children on her income. The visitation worker observed that Kaitlyn was depressed and struggling to manage her mental health. Kaitlyn lacked a support system and would "shut down," not showering for days. Kaitlyn would tell the visitation worker that she would reach out to her therapist, but the worker was unsure if Kaitlyn had followed through.

Kaitlyn also becomes fixated on certain items to the point that she is unable to focus on her children. Once Kaitlyn was looking for a marker lid during visitation and did not notice that Benjamin was crawling toward a fan. The visitation worker moved Benjamin away from the fan three times within the short period when Kaitlyn was trying to find the marker lid. One of Kaitlyn's goals during the 15-week intensive family preservation program in April 2021 was to work on not hyperfocusing on tasks and to provide care for her children when she was emotionally dysregulated.

In addition, Kaitlyn is agitated by the visitation workers redirecting her or taking notes during visits. Kaitlyn has expressed to case professionals that she does not like being constantly supervised.

There were also instances where Kaitlyn would become upset and would be unable to focus her attention on parenting her children. For example, in October 2021 a family team meeting occurred in tandem with a visit in Kaitlyn's home. During the meeting, Kaitlyn was given both positive and constructive feedback on her case progress. Kaitlyn found the feedback to be too critical of her and "became very dramatic and could not regulate emotions to the point the visit had to end." Kaitlyn was holding Skyanna and sobbing, stating that she no longer trusted or wanted to work with any of the case professionals.

Wacker-Ventris was called by the visitation worker to end the visit a few hours early because Kaitlyn could not focus on the children and was very upset. In response, Kaitlyn threatened to call the police if visitation staff took her children back. Kaitlyn also blocked Wacker-Ventris and told her that she was never allowed to talk to Kaitlyn again. Kaitlyn did not speak to Wacker-Ventris for a few days, but visits were able to resume the following week.

Kaitlyn agreed that she has had many breakdowns in front of her children and that she has not paid attention to her children during these breakdowns.

At one point during the case, Kaitlyn had progressed to monitored visits and was able to have 1 hour of unsupervised visits for every 4 hours of supervised visits. Monitored visits lasted for 3 to 4 months at the end of 2021.

Deb Fisher, the manager of the family support agency that provided visitation to Kaitlyn from October 2021 to early 2022 testified that "[t]he longer we served the case and the more time we spent with Kaitlyn and the children, the more we were given examples of sometimes her inability to regulate her emotions." In November 2021, Kaitlyn contacted her visitation worker to say that Skyanna was vomiting repeatedly during monitored visits. By the time the visitation worker arrived 5 minutes later, Kaitlyn had called an ambulance. In December 2021, Kaitlyn would not allow visitation staff back into her home and again told them if they came back she would call the police. Kaitlyn resumed having fully supervised visitations with the children due to concerns for the children's safety.

From January 2022 to the time of trial, Kaitlyn has had no unsupervised parenting time. Wacker-Ventris decided against progressing to overnight visits due to safety concerns, as Kaitlyn would report that she would get overwhelmed by parenting her children and would not know what to do. Wacker-Ventris was worried that Kaitlyn would be overwhelmed in the middle of the night and not tend to the children's needs.

Amanda Schwanke, a Head Start home visitor, has been working with Kaitlyn since January 2022, though Kaitlyn had been involved in the Head Start program for a couple of years prior to Schwanke's involvement with the family. Benjamin was Schwanke's target child as Skyanna had aged out of the service. Schwanke went to Kaitlyn's home once a week for 90 minutes to work on Benjamin's gross motor skills, as well as parent attachment and bonding. Benjamin initially was not making "clear sounds," but since Schwanke taught Kaitlyn how to model the sounds, Benjamin's language development has progressed.

Kaitlyn's family goal was to work on her mental health. Schwanke testified that she typically works on family goals for 6 months to a year and ideally sees progress in different stages. It is not typical for a family to have the same Head Start goal for 2 years. Schwanke agreed that she and Kaitlyn were working on similar issues with Benjamin as Kaitlyn had previously worked on with Head Start regarding Skyanna.

Schwanke reported that there have been instances where Kaitlyn becomes overwhelmed. The children have a "freeze reaction" to Kaitlyn's elevated emotions. They will stop talking, go toward another adult, and avoid Kaitlyn until she has calmed down.

There have been several instances when Kaitlyn asked the children whether they love her or tells them that they do not love her if they do not respond to her in a specific way. Kaitlyn has difficulty letting the children express what they want. Kaitlyn will tell the children that the foster parents are not mom and dad, which makes Skyanna shut down.

Schwanke has also observed that Benjamin knows that he must seek Kaitlyn out for comfort and will go to her when he is upset. Other toddlers Benjamin's age usually sit and cry until their caregivers come to them. Schwanke noted that Kaitlyn will ask Skyanna to help Benjamin instead of getting up and attending to his needs herself.

Schwanke described Kaitlyn's issue with multitasking and noted that she tends to get very focused on an activity, leaving her children unsupervised. At a community Head Start event, Kaitlyn did a family development activity alone while her children played in the classroom with other adults.

Schwanke testified that Kaitlyn has made progress with the Head Start program. She is less reactive to mess and chaos. Kaitlyn can provide the children with routine and Schwanke believes that the children are bonded to Kaitlyn.

Kaitlyn testified that she is very connected to Skyanna and knows all her cues. She recalled teaching Skyanna how to ride a bike. Kaitlyn stated that Benjamin seeks her out when he is upset and believes that both children are bonded to her.

Kaitlyn has been working with a therapist during the case, but Wacker-Ventris has been unable to discuss Kaitlyn's progress with any of her providers. Wacker-Ventris had requested a released to be signed, but that had not yet occurred at the time of trial.

Kaitlyn testified that she is currently seeing a therapist twice weekly as well as a psychiatrist once a month for medication management. She reported that she has borderline personality disorder, bipolar disorder, anxiety, depression, and post-traumatic stress disorder. Kaitlyn stated that she engages her coping skills daily to appropriately parent the children and is compliant with taking her medication. Kaitlyn conceded that once, because she had been anxious about an individual who was at large in Dodge County, she then took more than the prescribed dosage of sleeping pill to calm herself.

Wacker-Ventris testified that the Department was troubled by Kaitlyn's inability to sustain her case plan progress. The Department did not recommend reunification based on the inconsistency of Kaitlyn's progress and concerns that the children's needs would not be met if they were reunified. The Department remained concerned about Kaitlyn's mental health and how the lack of her mental health management impacts those around her, including the children.

(c) Conflict With Case Professionals

Wacker-Ventris testified that Kaitlyn had conflict with several visitation workers assigned to the case. Kaitlyn's agitation with the workers would escalate to the point where she "slowly fired each of the workers." Kaitlyn's unwillingness to work with certain providers caused a delay in services.

Some providers indicated to Wacker-Ventris that they were planning to cancel their contract to provide services to Kaitlyn based on her treatment of the staff. Wacker-Ventris would have mediated conferences to try to retain the service providers for Kaitlyn, though the conferences were not always successful. As providers gave their notice, it created a gap in the ability to have supervised visitation, which slowed Kaitlyn's case progress. At the time of trial, Kaitlyn was on her fourth visitation provider because of personality conflicts.

Fisher testified that she made the decision to end services for Kaitlyn because "we had kind of run out of staff by which Kaitlyn was agreeable to continue to work with." Kaitlyn attempted to fire the agency twice, the first time changing her mind.

Fisher described visits between Kaitlyn and the children as difficult because Kaitlyn would get very frustrated. If Kaitlyn was agitated during visits, she would "get caught up in making an hour's worth of phone calls or sending texts" instead of focusing on the children. Fisher believed that Kaitlyn did not like having so many people in her life "telling her what to do." Kaitlyn testified that the visitation workers were "young girls [who] didn't have kids of their own, trying to tell me how to . . . parent my children. And I was not very fond of that." Fisher stated that she had to mitigate personality conflicts between Kaitlyn and the workers often, sometimes daily.

Kaitlyn called Fisher many times to express her frustration with having so many case professionals observing her and a perceived lack of communication with Wacker-Ventris and the children's foster parents. Sometimes Fisher was able to provide feedback, and sometimes Kaitlyn was not receptive and would become more anxious and frustrated, sending numerous and at times inappropriate, texts, phone calls, and emails. Kaitlyn would also threaten to call the police on visitation workers if they were to check on the children during monitored visits.

Kaitlyn made specific demands and requests to the visitation staff and Fisher struggled to help Kaitlyn understand that "not everything was as drastic as she made it sound or as urgent as she wanted to tell others."

Beth Yeates was a family support worker and visitation worker from March to August 2022. Kaitlyn would get angry with Yeates when she did not like the advice or feedback Yeates provided to her and she was generally agitated that Yeates had to create visitation notes. Kaitlyn would also become upset with Yeates about things happening in the children's foster placement that she wanted to change but Yeates had no control over.

Kaitlyn would be argumentative in person, give Yeates the silent treatment during visits, and later Yeates would receive text messages from Kaitlyn saying that Yeates was ruining Kaitlyn's chances to reunify with the children. Typically, after Kaitlyn had time to reflect upon what she said, she would apologize to Yeates and they would move forward. Yeates stated that the pattern of conflict and reconciliation occurred several times in the months they worked together. Yeates and Kaitlyn spoke about ways to prevent the escalation, but the pattern would persist because Kaitlyn would not follow the agreed upon plan.

Kaitlyn's most recent visitation worker testified that Kaitlyn sometimes gets upset and sends her long text messages. Recently, Kaitlyn texted an angry message in response to the worker redirecting Kaitlyn during a visitation. The worker reported these messages to her supervisor but did not otherwise address them.

Kaitlyn also had conflict with Wacker-Ventris; sending aggressive text messages, blocking Wacker-Ventris from contacting her, and threatening to call the police if Wacker-Ventris came to Kaitlyn's home for their scheduled monthly visit.

Kaitlyn's intensive family preservation worker noticed an improvement in Kaitlyn's use of her coping skills. The worker previously worked with Kaitlyn in early 2020, and a year later observed that Kaitlyn had made progress in her case plan and was no longer threatening to call the police.

### (d) Children's Needs

A letter from Erin Wegner, a licensed mental health practitioner, was entered into evidence. The letter stated that Wegner began providing therapy to Skyanna and Kaitlyn in September 2021. The first three sessions were with Kaitlyn alone so that Wegner could complete an attachment assessment. She then facilitated five therapy sessions between Kaitlyn and Skyanna. Kaitlyn was present and positive with Skyanna during the sessions but ceased therapy with Wegner in March 2022 "due to concerns about Skyanna's age." The Department inquired about restarting sessions later, but due to Wegner's wait list the family would not be seen for several months.

Jann Strutzenberg, a licensed mental health counselor, began seeing Skyanna individually in June 2022, when she was 3 years. Strutzenberg worked with Skyanna for 5 months and described Skyanna as "delightful" and "expressive."

In sessions with Strutzenberg, Skyanna referred to her foster family, whom she has been placed with for most of her life, as "mom and dad." Skyanna would sometimes call Kaitlyn "mom," but viewed her more as a playmate or friend. Skyanna had a secure attachment style to her foster parents and a disorganized or anxious attachment to Kaitlyn. Strutzenberg indicated that Skyanna's lack of a secure attachment to Kaitlyn was because Skyanna had not been living with or depending on Kaitlyn to meet her needs.

Strutzenberg did not observe Skyanna to have any social, emotional, or intellectual issues. The foster parents reported that Skyanna at times would cry or not want to visit Kaitlyn, but in sessions with Strutzenberg, there was no explanation by Skyanna, as if her protests were not "a big deal to her." Skyanna had been resilient through the transition required by visits.

Strutzenberg worked with Skyanna on identifying and expressing feelings. Strutzenberg recommended enrolling Skyanna in prekindergarten, as enrolled children thrive socially when they reach school age because they have had additional structured play time with peers of their own age. Kaitlyn testified that she did not want Skyanna to go to prekindergarten because she did not want any time taken away from visitations with Skyanna. During Kaitlyn and Strutzenberg's conversation regarding prekindergarten, Kaitlyn became agitated and said she would not talk about it anymore. Kaitlyn conceded that her caseworker had told her that the Department would keep her visitation at 30 hours per week but would shift the time to accommodate Skyanna attending prekindergarten.

Skyanna and Benjamin's foster father testified that he and his wife have tried to enroll Skyanna in prekindergarten but were unable to because Kaitlyn maintains educational rights to the children. The foster father reported that both Skyanna and Benjamin are doing well.

Dru McMillan, a licensed independent mental health practitioner and licensed clinical social worker, testified as an expert witness. McMillan had not met Kaitlyn, Skyanna, or Benjamin, but had reviewed collateral information and case records in preparation for her testimony.

McMillan noted that, following intensive family preservation, child-parent psychotherapy was recommended. McMillan believed this therapy would have been effective, but it was never sought because Kaitlyn indicated to the caseworker that she was not interested in seeking family therapy.

McMillan stated that parents who have untreated borderline personality disorder are emotionally inconsistent in their parenting and their availability to their child. The children of these

parents tend to be diagnosed with mental health or trauma disorders later in life. McMillan also noted that a parent who is unable to regulate themselves and unable to assist the child in learning emotional regulation, could have lasting damage on the child's ability to develop emotionally, socially, and cognitively.

### 3. ORDER

Following the termination hearing, the juvenile court entered an order on January 26, 2024, terminating Kaitlyn's rights to Skyanna and Benjamin. The court found that the State had met its burden of proving substantial and continuous neglect, and that the children had been in out-of-home placement for 15 or more months out of the most recent 22 months pursuant to § 43-292(2) and (7). The court also found that pursuant to § 43-292(6), Kaitlyn failed to correct the conditions that led to the children being adjudicated under § 43-247(3)(a). The court further found that Kaitlyn was an unfit parent and that it was in the best interests of the children to have Kaitlyn's parental rights terminated.

Kaitlyn appeals.

## III. ASSIGNMENT OF ERROR

Kaitlyn assigns that the juvenile court erred by finding that the termination of her parental rights was in the children's best interests.

## IV. STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the findings made by the juvenile court below. *In re Interest of Denzel D.*, 314 Neb. 631, 992 N.W.2d 471 (2023). However, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the juvenile court observed the witnesses and accepted one version of the facts over another. *Id*.

## V. ANALYSIS

### 1. STATUTORY GROUNDS FOR TERMINATION

The juvenile court found that the State had presented clear and convincing evidence to satisfy § 42-292(2), (6), and (7). Kaitlyn does not challenge the juvenile court's finding that statutory grounds to terminate have been met. However, because our review is de novo, we address this requirement for termination of parental rights.

Section 43-292(7) allows for termination when the juvenile has been in an out-of-home placement for 15 or more months of the most recent 22 months. It operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of a parent. *In re Interest of Kenna S.*, 17 Neb. App. 544, 766 N.W.2d 424 (2009). In a case of termination of parental rights based on § 43-292(7), the protection afforded the rights of the parent comes in the best interests step of the analysis. *Id*.

Here, both Skyanna and Benjamin have been in out-of-home placement for 15 or more months of the most recent 22 months. Skyanna was removed from Kaitlyn's care on June 20, 2019, was briefly reunified with Kaitlyn on January 2, 2020, and was removed for a second time on May 6, 2020. Benjamin was removed from Kaitlyn's care on January 21, 2021. The State filed motions

for the termination of parental rights on April 22, 2022. The existence of the statutory basis alleged § 43-292(7) should be determined as of the date the petition or motion to terminate is filed. See *In re Interest of Jessalina M.*, 315 Neb. 535, 997 N.W.2d 778 (2023). Both children have remained out of the home since their respective removal. At the time of filing the amended petitions, Skyanna had been in out-of-home placement for a total of 30 months, and Benjamin for 15 months. Thus, the statutory requirement for termination under § 43-292(7) has been met.

If an appellate court determines that the lower court correctly found that termination of parental rights is appropriate under one of the statutory grounds set forth in § 43-292, the appellate court need not further address the sufficiency of the evidence to support termination under any other statutory ground. *In re Interest of Becka P. et al.*, 27 Neb. App. 489, 933 N.W.2d 873 (2019). Because the State presented clear and convincing evidence that the children have been in an out-of-home placement for 15 or more months of the most recent 22 months, statutory grounds for termination of Kaitlyn's parental rights exists.

### 2. PARENTAL UNFITNESS AND BEST INTERESTS

In addition to providing a statutory ground, the State must show that termination of parental rights is in the best interests of the child. *In re Interest of Gabriel B.*, 31 Neb. App. 21, 976 N.W.2d 206 (2022). In light of the constitutionally protected nature of the parent-child relationship, there is a rebuttable presumption that it is in the child's best interests to share a relationship with his or her parents. *In re Interest of Denzel D.*, 314 Neb. 631, 992 N.W.2d 471 (2023). The presumption that it is in the child's best interests to share a relationship with his or her parent can only be overcome by a showing that the parent either is unfit to perform the duties imposed by the relationship or has forfeited that right. *Id*. Parental unfitness means a personal deficiency or incapacity that has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and that has caused, or probably will result in, detriment to a child's well-being. *Id*.

The best interests analysis and the parental fitness analysis are fact-intensive inquiries. *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228 (2015). While both are separate inquiries, each examines essentially the same underlying facts. *Id*. In proceedings to terminate parental rights, the law does not require perfection of a parent; instead, courts should look for the parent's continued improvement in parenting skills and a beneficial relationship between parent and child. *In re Interest of Becka P. et al.*, 27 Neb. App. 489, 933 N.W.2d 873 (2019).

Kaitlyn argues that she is a fit parent because she loves her children and shares a bond with them. Trial testimony evidenced the love Kaitlyn has for her children. However, the Nebraska Supreme Court has held that having a bond with a child does not make the parent a fit person to provide parental care for the child. See *In re Interest of Alec S.*, 294 Neb. 784, 884 N.W.2d 701 (2016). Rather, the evidence adduced at the termination trial demonstrates that Kaitlyn is unable to provide her children with the level of parental care they require.

Kaitlyn has struggled to properly manage her mental health throughout the juvenile case. Kaitlyn has been diagnosed with borderline personality disorder and the symptoms of her disorder, namely anger and hostility, were present in many of her interactions with case professionals. Kaitlyn has had to work with four different visitation companies because she is unable to regulate her emotions. Instead, she lashes out at visitation workers by threatening to call the police on them

or by sending the workers aggressive text messages and voicemails. The constant turnover of visitation providers has slowed Kaitlyn's case progress. Kaitlyn had similar conflict with her caseworker. She was also discharged from therapy after she expressed wanting to kill a visitation worker.

Most importantly, Kaitlyn's inability to manage her mental health has affected the children. Kaitlyn has expressed that she is overwhelmed by basic parental tasks, such as cleaning up the children's toys. When Kaitlyn becomes overwhelmed or agitated, she has both a physical and emotional response. The children know to avoid her when she is overwhelmed and seek out other adults for comfort. Visitations have ended early because Kaitlyn was unable to maintain the composure necessary to keep the children safe. Kaitlyn has not progressed beyond monitored visits due to concerns that she would become overwhelmed while unsupervised and cease caring for her children.

Kaitlyn has struggled to supervise her children when she is having a breakdown or is in a state of hyper fixation. By Kaitlyn's own admission, she has had breakdowns in the presence of her children and is unable to pay attention to them during her breakdowns. Kaitlyn has left the supervision of her children to visitation workers and other adults when she is fixated on an insignificant task, such as finding a lid to a marker.

We are concerned that Kaitlyn stopped family therapy with Skyanna after five sessions and was not interested in participating in family therapy again, despite intensive family preservation recommending child-parent psychotherapy. Kaitlyn likewise did not want Skyanna enrolled in prekindergarten, though the enrollment was recommended by Skyanna's counselor for her social development and the Department assured Kaitlyn that she would be able to maintain 30 hours of visitation with Skyanna.

Kaitlyn has been serviced by a variety of supports over several years. Though issues at the beginning of the case, such as domestic violence and feeding, have been addressed, Kaitlyn has been unable to adequately manage her mental health. McMillan testified that children of parents with an untreated personality disorder tend to develop mental health issues and trauma diagnoses as they get older. Kaitlyn's borderline personality disorder has led to inconsistency in her parenting and emotional availability to her children.

Where a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the best interests of the child require termination of the parental rights. *In re Interest of Zanaya W. et al.*, 291 Neb. 20, 863 N.W.2d 803 (2015). Based on the evidence presented, there has been minimal change in Kaitlyn's behavior over the course of the case, and based on Kaitlyn's need for professional coaching and prompting years into her case, she is unlikely to change in the future. Though at times Kaitlyn made progress in her case plan, she was unable to sustain it beyond a couple of months.

Further, Nebraska courts have recognized that children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. See *In re Interest of Octavio B. et al.*, 290 Neb. 589, 861 N.W.2d 415 (2015). Skyanna and Benjamin have been in foster care for most of their lives. They deserve stability and should not be suspended in foster care when Kaitlyn is unable to rehabilitate herself. Accordingly, we find there was clear and convincing evidence to show that Kaitlyn was unfit and that terminating her parental rights was in the children's best interests.

## VI. CONCLUSION

We conclude the State proved by clear and convincing evidence that grounds for termination of Kaitlyn's parental rights existed under § 43-292(7) and that termination of her parental rights is in the children's best interests. Accordingly, the juvenile court's order is affirmed.

AFFIRMED.